IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Grace Dibiase, | ) | C/A No.: 1:09-338-RBH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| Michael J. Astrue, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a report

and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff Grace

Dibiase ("Plaintiff" or "Claimant") brought this action pursuant to 42 U.S.C. § 405(g) to

obtain judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two

issues before the court are whether the Commissioner's findings of fact are supported by

substantial evidence and whether he applied the proper legal standards.

I.      Relevant Background

        A.      Procedural History

        On September 16, 2003, Plaintiff filed an application[1] for disability insurance

benefits under Title II of the Social Security Act ("the Act"), which is codified at 42

---

[1]Plaintiff previously filed an application for benefits from a disability she alleged
began February 14, 2000. That claim was denied initially and on reconsideration; on
September 27, 2002, the ALJ found she was not disabled.

U.S.C. §§ 401–433 (2004). (Tr. 82–85.) Plaintiff's applications were denied initially (Tr. 32, 76-80) and on reconsideration (Tr. 30, 71–73). Administrative Law Judge Gregory Wilson ("ALJ") held a hearing on June 2, 2005 at which Plaintiff, her representative, and a Vocational Expert ("VE") appeared. Plaintiff initially claimed a disability-onset date of March 8, 2002. (Tr. 17.) However, her attorney submitted a form prior to the hearing requesting that the onset date be amended to June 30, 2003. The ALJ issued a decision on September 23, 2006, finding Plaintiff was not disabled within the meaning of the Act. (Tr. 17–29.) On January 6, 2009, the Appeals Council denied Plaintiff's request for further review (Tr. 4–8), making the ALJ's decision the Commissioner's final administrative decision. On February 10, 2009, Plaintiff filed the present action seeking judicial review of the Commissioner's decision.

B.     Plaintiff's Background and Medical History

Plaintiff was born in 1944 and was 60 years old at the time of her hearing before the ALJ. Plaintiff completed the eleventh grade and has obtained her GED. (Tr 352.) She has also taken classes in trade school and college, but she has not obtained a post-secondary degree. (Tr. 353.)

Plaintiff underwent a colonoscopy on May 25, 2001, which showed "moderately advanced severe sigmoid diverticular disease." (Tr. 328.) On February 8, 2002, Plaintiff reported to the emergency room ("ER") at the U.S. Naval Hospital in Beaufort, South Carolina, complaining of a headache, nausea, and dizziness after a box fell on her head at a Wal-Mart. (Tr. 319.) She reported to the ER again the following day when her dizziness

and headaches had not improved. (Tr. 318.) Kelvin Bray, M.D., an internal medicine specialist at the Naval Hospital, assessed Plaintiff on March 21, 2002, on referral for possible concerns of depression, anxiety, and spousal abuse. (Tr. 325–26.) He found that Plaintiff "demonstrated good insight and judgment, and had a normal mental status examination." (Tr. 326.) He assessed a possible adjustment disorder secondary to life's events and declined to prescribe any medication. (*Id.*)

On June 9, 2003, Dr. Bray diagnosed Plaintiff with myofascial pain syndrome, described as chronic muscle pain centered around sensitive points in muscles called trigger points. (Tr. 310.) On June 12, 2003, Plaintiff was seen by a physical therapist at the Naval Hospital for neck pain for the prior seventeen months. She stated that she was unable to hold down a job secondary to her neck pain. (*Id.*) Plaintiff denied radicular (radiating pain) symptoms at the time of the visit. (*Id.*) Physical examination revealed range of motion within normal limits in her shoulder and cervical spine. (*Id.*) The therapist assessed degenerative disc disease of the cervical spine with a muscular component and prescribed a TENS unit. (*Id.*)

Physical Therapist Wendy Bunch provided physical therapy treatment to Plaintiff intermittently from September 2003 to March 2005. (*See generally* Tr. 218–336 (Naval Hospital records).) Ms. Bunch completed an initial consultation report in September 2003, finding Plaintiff had decreased range of motion in all directions in her cervical spine and muscle spasms in her upper trapezius muscles. (Tr. 298.) Plaintiff reported increased neck pain after being hit on the head about eighteen months before the September 2003 visit;

Plaintiff rated her neck pain as 5/10. (*Id.*) Plaintiff had physical therapy with Ms. Bunch on October 14, 2003, at the Naval Hospital, and she reported decreased pain when doing stretches to counteract attacks. (Tr. 288.) Ms. Bunch's physical exam of Plaintiff showed "continued 3/5 spasms in the cervical spine," and she noted that progress was slow. (*Id.*) The records indicate Plaintiff was responding to treatment and that her complaints were likely to be long-term, requiring repeated series of therapy. (*Id.*) Ms. Bunch's notes indicate Plaintiff was to continue her home program on a regular basis to prevent exacerbations. (*Id.*)

Plaintiff had physical therapy with Ms. Bunch on October 20, 2003, and her notes indicate Plaintiff had cervical pain and lower back pain and numbness and tingling in the right hand when doing activities like holding a phone. (Tr. 286.) Plaintiff reported difficulty at home secondary to injury, explaining she was trying to take care of her sick husband at the same time. (*Id.*) Her physical exam showed 4/5 strength bilaterally. (*Id.*)

Plaintiff saw Dr. Bray on October 23, 2003, and his notes reflect that Plaintiff complained of intermittent sleep problems and was attending physical therapy for back pain. He assessed osteoarthritis. (Tr. 310.) On November 6, 2003, Plaintiff did not keep her appointment with Dr. Bray. (*Id.*) An undated note from the Naval Hospital noted "investigations" for Plaintiff's possible osteoarthritis/myofascial pain, poor sleep, and anxiety. (Tr. 311.)

At the request of the Commissioner, state agency physician George T. Keller, M.D., reviewed the medical evidence and completed a physical residual functional capacity

("RFC") assessment on November 13, 2003. (*See* Tr. 164–170.) Dr. Keller opined that Plaintiff could lift 50 pounds occasionally, 25 pounds frequently; stand, walk or sit for six hours each during an eight-hour workday; frequently climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; occasionally climb ladders, ropes, or scaffolds; and occasionally reach overhead. (Tr. 165–67.) Dr. Keller found Plaintiff had no visual, communicative, or environmental limitations. (Tr. 167–68.)

On November 18, 2003, clinical psychologist Scott Shaffer, Ph.D., examined Plaintiff at the request of the Commissioner. (Tr. 172–74.) He noted that Plaintiff drove herself to the interview, walked slowly with apparent discomfort, and was appropriately groomed and dressed. (Tr. 172.) During the interview, Plaintiff was "pleasant and cooperative with adequate concentration." (*Id.*) Plaintiff reported that she was capable of bathing and dressing herself and that her hobbies included crocheting. (Tr. 173.) Plaintiff's thoughts were appropriate, well-ordered and direct; her speech was spontaneous and understandable; her memory was adequate; her judgment and insight appeared adequate; and her cognitive skills appeared satisfactory. (*Id.*) Dr. Shaffer noted that Plaintiff was gloomy and mildly depressed with mild anxiety. (*Id.*) He opined that Plaintiff's occupational endeavors should be in situations with limited stress and that her concentration and timely task completion may be difficult in view of her mild depression. (Tr. 174.) Dr. Shaffer assessed a mood disorder with depressive features. (*Id.*)

At the request of the Commissioner, state agency psychologist Judith M. Von, Ph.D., reviewed the medical evidence and completed a psychiatric review technique form

on December 3, 2003. (*See* Tr. 175–188.) Dr. Von opined that Plaintiff had mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 185.)

A letter from Dr. Bray dated January 15, 2004 stated the following:

I am writing on the behalf of my patient Grace DiBiase. I am her current medical provider here at the Naval Hospital and she has disclosed to me that she has been unable to hold her previous occupation over the past year secondary to her ongoing and progression of her medical condition. She has multiple medical problems that myself and that sub-specialists have been following. Her active ongoing medical problems are as follows: Myofascial pain syndrome (followed by Dr. Kelly-PM&R), Fibromyalgia/OA (followed by Dr. Brittis-Rheumatology), Diverticular disease with recurrent diverticulitis, and progressive DJD of her cervical spine (previously seen and evaluated in our Orthopedics clinic as well). She also has other stable medical conditions (hypothyroidism, hyperlipidemia, and recurrent eczematous dermatitis). As a result, we collectively have had to intensify her treatment here at the naval hospital. I am requesting that you consider her for disability at this time since she has been unable to hold her previous job.

(Tr. 213.)

On May 3, 2004, Plaintiff was assessed by Louis Plzak, M.D., for urinary incontinence and pelvic pain radiating to her left knee. (Tr. 189–91.) He recommended a CT scan to rule out kidney stones and a cystoscopy, which is a procedure to examine the interior lining of the bladder and urethra. (Tr. 189.) A CT scan on May 11, 2004, was normal, showing no obstruction or kidney stones. (Tr. 269.)

On May 24, 2004, Kathy Blaydes, LPC, wrote a letter regarding Plaintiff's mental health. (Tr. 192.) Ms. Blaydes said that she had seen Plaintiff on three separate occasions for approximately one-hour sessions (*id.*); however, the record does not contain any

treatment notes documenting these counseling sessions. Ms. Blaydes believed Plaintiff had major depression and described her symptoms as including sleep and appetite disturbance, impairments in memory and concentration, and poor energy. (*Id.*) Ms. Blaydes opined that Plaintiff's symptoms of depression severely impaired her ability to socialize, gain employment, and care for everyday needs. (*Id.*)

At the request of the Commissioner, state agency psychologist W. Pearce McCall, Ph.D., reviewed the medical evidence and completed a psychiatric review technique form and mental RFC assessment on June 10, 2004. (*See* Tr. 193–210.) Dr. McCall opined that Plaintiff was moderately limited in her ability to carry out detailed instructions and maintain attention and concentration for extended periods. (Tr. 207.) He also opined that Plaintiff was moderately limited in her ability to complete a normal work week, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in the work setting, travel in unfamiliar places, and set realistic goals. (Tr. 208.) Dr. McCall opined that the credible evidence from Drs. Shaffer and Bray indicated that Plaintiff had a moderate mental impairment. (Tr. 209.) He gave less weight to the statements from Ms. Blaydes because he did not consider her as an acceptable medical source. (*Id.*) Dr. McCall opined that Plaintiff was able to perform simple tasks for a full work day without the need for special help or supervision. (Tr. 209–10.) In addition, she could make simple work-related decisions and be on time and work within a schedule. (Tr. 209.)

Plaintiff had physical therapy with Ms. Bunch on July 21, 2004. (Tr. 268.)  She had not been to therapy since May 17, 2004, and Ms. Bunch's notes indicate Plaintiff explained she had been unable to attend for that period because of multiple problems including diverticulitis, bladder infections, stress, transportation issues, and an unsupportive husband.  (*Id.*)  She reported left hip pain greater than right hip pain and an inability to get out of bed some days because of pain that was a 9/10. (*Id.*)  Ms. Bunch assessed Plaintiff with fibromyalgia and noted her progress would depend on her compliance with the treatment plan. (*Id.*)

On July 28, 2004, Dr. Bray sent a letter to the Disability Office, opining that Plaintiff had been unable "to hold a job since her overall medical condition worsened in June 2003." (Tr. 212.)  He wrote that the pain in Plaintiff's lower back limited her to standing or sitting for 30–60 minutes at a time. (*Id.*)  Dr. Bray also opined that Plaintiff's "mild weakness and progressive arthritis in her hands" prohibited her from typing. He stated that he believed Plaintiff was unable to "do any substantial lifting" and "would require moderate to maximal assistance from a co-worker" for any job. (*Id.*)  Further, Dr. Bray opined that Plaintiff was "not expected to fully recover, and will not to the degree of being able to return to work within the next 12 months and beyond." (*Id.*)

Also on July 28, 2004, Plaintiff had her annual examination. (Tr. 266.)  Plaintiff reported that she continued to suffer from diffuse body aches and pains, occasionally experienced dizzy spells, and that she had experienced about four attacks of diverticulitis in the prior year that had required antibiotics. (*Id.*)  She indicated she had not returned to

the urology department for a recommended cystoscopy because of her stomach and lower

back problems. (*Id.*) The notes report a past medical history of myofascial pain syndrome,

hypothyroidism, diverticulitis, hyperlipidemia (high cholesterol), eczema (inflammatory

condition of the skin), degenerative disc disease, and fibromyalgia. (*Id.*) Dr. Bray

observed that Plaintiff was conversant and presented a normal mood and communicative

skills. (*Id.*)

On September 1, 2004, Plaintiff saw Dr. Bray for follow-up on her laboratory

results. At that time, she reported a wart on her finger, but otherwise noted no other

complaints. (Tr. 262.) Dr. Bray observed that Plaintiff was conversant and demonstrated a

normal mood and communicative skills. (*Id.*) Dr. Bray prescribed Zocor for Plaintiff's

high cholesterol and removed the wart. (*Id.*) Dr. Bray released Plaintiff without

limitations. (*Id.*) Plaintiff reported to the Naval Hospital later in September 2004 with left

leg muscle aches that were attributed to a side effect of prescription Zocor. (Tr. 240.) The

examiner recommended discontinuation of Zocor and did not start any other medication at

that time for Plaintiff's elevated cholesterol. (Tr. 240–41.)

A July 28, 2004 letter from Wendy Bunch, PT, WCC stated the following:

Ms. DiBiase has been seen in Physical Therapy off and on for the past two
years . . .. She suffers from various ailments including diverticulitis, various
myalgias, hypothyroidism and reflux disease. Patient has received treatments
of interferential electrical stimulation to the spine, been provided with
exercise to increase flexibility and strength, instructed in relaxation exercises
and bowel and bladder health, and patient continues to have tremendous
pain. Patient reports that she has tried walking programs and every exercise
program she has tried has increased her pain. Patient states she tenses up

with exercise to the point that she can't move. Patient also experiences stomach pain and discomfort on a regular basis, exacerbated by stress.

Patient presents with 3–4/5muscle spasms of the paraspinals in all three levels of the spine. Patient presents with pelvic rotation and malalignment, possibly leg length discrepancy, bilateral hamstring tightness and decreased cervical range of motion. Gross MMT of 4/5.

It is recommended that she have a Functional Capacity Evaluation before returning to any form of work.

(Tr. 211.)

Plaintiff had physical therapy with Ms. Bunch on August 3, 2004, reporting increased neck pain and continued left hip-and-leg pain. (Tr. 263.) Plaintiff next visited Ms. Bunch for physical therapy on August 11, 2004, at which time she reported feeling great on Saturday, being unable to walk on Sunday, and gradually getting better over the prior two days. (Tr. 259.) She rated her pain as 6/10. (*Id.*) Plaintiff was provided with and instructed in gait with a cane secondary to repeated episodes of dizziness and was assessed with cervical spondylosis without myelopathy and disorders of the sacrum. (*Id.*) On August 23, 2004, Ms. Bunch's note stated that Plaintiff's progress was slow and "hindered by inconsistent attendance." (Tr. 254.) At this visit, Plaintiff reported that she had no change in pain and that therapy was only short-lived in pain relief. (*Id.*) Plaintiff again saw Ms. Bunch on August 25, 2004, at which time she reported that she stopped walking a couple weeks before because of pain in her foot; Ms. Bunch's notes indicate she planned to initiate exercise, such as bicycling at her next visit. (Tr. 251.)

Plaintiff again saw Ms. Bunch on September 10, 2004, and reported no new complaints. Ms. Bunch's notes indicate Plaintiff had tolerated physical therapy well. (Tr. 245.) On October 18, 2004, Plaintiff saw Ms. Bunch, whose notes indicated Plaintiff had been inconsistent with her treatment and was showing no progress toward her goals. (Tr. 237.) At that visit, Plaintiff indicated she had been ill, and she reported increased low back pain and right-sided pelvic pain. (*Id.*) On October 22, 2004, Plaintiff visited Ms. Bunch and reported that she did her stretches as instructed, but that her neck continued to lock on a regular basis. (Tr. 235) Ms. Bunch's assessment indicated cervicalgia, disorders of sacrum, and spasm of muscle. (*Id.*) After another visit on October 27, 2004, Ms. Bunch noted Plaintiff would benefit from a dietary consult for her fibromyalgia, and recommended initiation of a more active exercise program, to include "biking, walking, leg press, elliptical, etc." (Tr. 233.)

On referral from Dr. Bray, Plaintiff presented to John Morley, M.D., a rheumatologist, on October 26, 2004, for assessment of her myalgias (muscle aches/pains). (Tr. 215.) He noted that Plaintiff complained of diffuse morning stiffness, lasting for hours and sometimes all day long, and particularly stiffness of the shoulders and neck with inactivity. (*Id.*) Plaintiff reported occasionally wearing a splint on her left wrist. (*Id.*) Physical examination revealed node formations in her hands; no synovitis (joint inflammation) in her wrists; nodular tenosynovitis (tendon inflammation) in both hands; symmetrical motion of the cervical spine and full range of motion in elbows and shoulders; no active synovitis in the knees, ankles, or feet. (*Id.*) Dr. Morley found

myofascial trigger points, which are sensitive, taut bands of muscle, and noted that the test for psychogenic rheumatism was negative. (*Id.*)  His impression was "fairly prominent osteoarthritis in her hands with nodular tenosynovitis." (*Id.*)

In November 2004, Plaintiff reported to the Naval Hospital for evaluation of dizziness, high blood pressure, and a diverticulitis flare-up. (Tr. 231–32.)  Plaintiff reported that her medications were making her tired and admitted that she had not completed her blood work. (Tr. 232.)  Physical examination revealed Plaintiff was in no apparent distress, she had appropriate speech and behavior and normal gait, and that she raised herself to a standing position without assistance. (*Id.*)  Plaintiff was diagnosed with myalgia and myositis (inflammation of a muscle), unspecified; unspecific acquired hypothyroidism; and diverticulosis. (*Id.*)  Plaintiff did not keep an appointment for a nutrition consultation on November 23, 2004. (Tr. 228.)

On January 27, 2005, Plaintiff reported to the Naval Hospital for follow-up on her diverticulitis and complaints of painful urination and vaginal itching. (Tr. 226.)  A physical examination was normal other than a small bladder prolapse.  (*Id.*)  The notes recorded that Plaintiff wore pads for her urinary incontinence, and that the pads may have caused an external yeast infection and itching. (*Id.*) The physician prescribed Monistat and referred Plaintiff to the gynecology department for treatment of urinary incontinence and bladder prolapse.  (*Id.*)  Plaintiff reported the following day to the OB/GYN clinic, where she admitted to the examiner that she was not doing Kegel exercises as often as she should. (Tr. 227.) Plaintiff was cooperative, friendly, and talkative. (*Id.*) Her physical

examination was normal. (*Id.*) The examiner instructed her in the importance of Kegel exercises and directed her to follow-up in two months if she did not improve. (*Id.*)

Plaintiff had physical therapy with Ms. Bunch on February 25, 2005. (Tr. 223.) She stated that her neck felt "out of whack" and that she had taken Robaxin that morning. (*Id.*) She complained of diverticulitis, that her back and neck were in spasm and her right shoulder felt like it had been strained. (*Id.*) Her physical exam showed 2/5 spasm in the left thoracolumbar paraspinals and the cervical region. (*Id.*) Ms. Bunch's notes indicated that Plaintiff had not attended therapy in several months and that Plaintiff had called to cancel and reschedule appointments. (*Id.*) Plaintiff tolerated the therapy session well and noted that her pain decreased by fifty percent. (*Id.*)

On February 28, 2005, Plaintiff again saw Ms. Bunch. Plaintiff reported that she had experienced relief after her prior physical therapy session, but that by Saturday there was a lot of pain between her shoulder blades and at the bottom side of her left shoulder blade. (Tr. 221.) Ms. Bunch noted that Plaintiff had not made progress towards her goals because of inconsistent treatment. (*Id.*) On March 21, 2005, Plaintiff saw Ms. Bunch, reported positive changes in her bowel habits and had no new complaints. (Tr. 218.) Ms. Bunch noted that Plaintiff made minimal progress and had difficulty following through on the prescribed home exercise program. (*Id.*)

On April 12, 2006, Michael Blakley, M.D., of the Beaufort Naval Hospital's Internal Medicine Department opined that Plaintiff's physical impairments and anxiety prevented her from maintaining gainful employment. (Tr. 337.) Although Dr. Blakley's

note indicated he had first assessed Plaintiff in December 2005, the record contains no examination records from him. Dr. Blakley stated in a letter dated November 24, 2006, that he was concerned Plaintiff was developing depression. (Tr. 338.) He also opined that Plaintiff's osteoarthritis and tenosynovitis of the hand made it difficult for her to type, that her neck and back pain made it difficult for her to sit in place or stand "for prolonged periods," and that her frequent diverticulosis made it difficult to predict what types of activities she could perform. (*Id.*)

II.   Discussion

In her brief, Plaintiff argues that the Commissioner's findings are in error for the following reasons:

1.    The ALJ failed to properly provide sufficient rationale for his conclusion that Plaintiff did not suffer from a combination of impairments that rendered her disabled;

2.    the ALJ failed to properly weigh lay evidence;

3.    the ALJ conducted a flawed RFC assessment; and

4.    the ALJ failed to give sufficient weight to credible evidence from acceptable medical sources.

A.    ALJ Findings

In his decision dated September 23, 2006, the ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through September 30, 2007.

2.   The claimant has not engaged in substantial gainful activity since June 30, 2003, the amended alleged onset date (20 CFR §§ 404.1520(b), 404.1571, *et seq*.).

3.   The claimant has the following severe impairments: degenerative joint disease of the cervical and lumbar spine, fibromyalgia (myofascial pain syndrome), osteoarthritis of the hands, and a depressive disorder with anxiety (20 § CFR 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1520(d), 404.1525, 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work activity.  Specifically, the claimant can lift and carry 50 pounds occasionally and 10 pounds frequently, and can stand for 6 hours out of an 8-hour workday, walk for 6 hours out of an 8-hour workday and sit for 6 hours out of an 8-hour workday.  The claimant is further limited to frequent climbing of stairs and ramps; no climbing of ladders, scaffolds and ropes; frequent balancing, stooping kneeling, and crouching; occasional overhead reaching; and frequent fingering.  Due to her mental condition, the claimant is limited to a job in a low stress environment with only occasional changes in the work setting and only occasional direct contact with other people.

6.   The claimant is unable to perform any past relevant work (20 CFR § 404.1565).

7.   The claimant was born on October 11, 1944 and was 58 years old on the alleged disability onset date, which is defined as an individual of advanced age (20 CFR § 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR § 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has

transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR § 404.1560(c), 404.1566).

11.     The claimant has not been under a "disability," as defined in the Social Security Act, from June 30, 2003, through the date of this decision (20 CFR § 404.1520(g)).

(Tr. 19–29.)

B.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines "disability" as follows:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of "disability" to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in

substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1; (4) whether such impairment prevents claimant from performing past relevant work; and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant "disabled or not disabled at a step," Commissioner makes determination and "do[es] not go on to the next step.").

A claimant is not disabled within the meaning of the Act if she can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling (SSR) 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to past relevant work, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national

economy that claimant can perform despite the existence of impairments that prevent the return to past relevant work. *Id.* If the Commissioner satisfies its burden, the claimant must then establish that she is unable to perform other work. *Id.; see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Social Security Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); s*ee Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek v. Finch*, 428 F.2d

at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.    Analysis

1.    Combination of Impairments

Plaintiff's initial allegation of error is that the ALJ did not provide sufficient reasoning to support his finding that Plaintiff did not suffer from a combination of impairments that rendered her disabled. Plaintiff argues that this error requires remand. (*See* Pl.'s Br. 15-17.) The court agrees.

Plaintiff claims that her combined impairments of degenerative joint disease, fibromyalgia, osteoarthritis, depressive disorder, diverticulitis, chronic pain, and urinary incontinence, when taken together, should have caused the ALJ to find her disabled. Citing the seminal Fourth Circuit case on this issue, *Walker v. Bowen*, 889 F.2d 47 (4th Cir. 1989), Plaintiff argues that, although the ALJ analyzed her ailments and found that she suffered from four "severe impairments," the ALJ failed to provide a detailed and "expressly analyzed conclusion" regarding why the combined effects of these impairments did not render her disabled. (Pl.'s Br. 16.) Plaintiff argues that the ALJ should have considered not only "the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful

activity." (*Id.*, at 16, n.3 (quoting *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974)).)

When, as here, a claimant has more than one impairment, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *Lemacks v. Astrue*, 9:07-2438-RBH-BHH, 2008 WL 2510087 (D.S.C. May 29, 2008), *aff'd*, 2008 WL 2510040 (D.S.C. June 18, 2008). Even if the claimant's impairment or impairments in and of themselves are not "listed impairments" that are considered disabling per se, the Commissioner must also "consider the *combined effect* of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B) (2004) (emphasis added). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.*

The Commissioner initially argues that Plaintiff's combination-of-impairments argument fails because Plaintiff "never indicates which listing she believes her impairments meet or equal." (Def.'s Br. 19.) For support, the Commissioner cites to a Ninth Circuit case that found a claimant had not satisfied her burden at step three of the sequential analysis because she had not indicated to which listed impairment(s) her

combined ailments were "medically equivalent." (*Id.*, citing *Burch v. Barnhart*, 400 F.3d 676, 682–83 (9th Cir. 2005).)

The Commissioner's argument improperly narrows the analysis required by the ALJ of a claimant's impairments in combination. Plaintiff does not limit her complaint about the ALJ's failure to consider her impairments together to the ALJ's step-three review of listed impairments. (Pl.'s Reply 1, 2.) Rather, Plaintiff argues that the ALJ failed to consider her ailments in combination throughout the analysis of her application for disability benefits. (*See id.*; *see also* Pl.'s Br.16–17 (arguing ALJ required to consider impairments in combination even if impairments "when taken singly, did not meet a listing requirement or otherwise render the claimant disabled.").)

The Commissioner's duty to consider the combined effect of Plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability process." 20 C.F.R. § 404.1523. Here, the ALJ failed to consider—or, at least failed to articulate whether and how he considered—Plaintiff's multiple impairments together, thereby violating 20 C.F.R. § 404.1523, which provides as follows:

> **Multiple Impairments**. In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, *the combined impact of the impairments will be considered throughout the disability determination process*. If we do not find that you

have a medically severe combination of impairments, we will determine that you are not disabled (see § 404.1520).

*Id.* (italics added).  *See also Fleming v. Barnhart*, 284 F. Supp. 2d 256, 270 (D. Md. 2003) ("The ALJ is required to assess the combined effect of a claimant's impairments throughout the five-step analytical process.")

The Commissioner alternatively argues, citing to decisions in other circuits, that the ALJ properly considered Plaintiff's impairments in combination by considering them "in turn."  (Def.'s Br. 22.)  The law in the Fourth Circuit is clear: in-turn consideration of multiple impairments is insufficient.  The underlying ALJ decision in *Walker* had included discussion of each of claimant's impairments separately, noting "the effect or noneffect of each." 889 F.2d at 49–50.  The Fourth Circuit overturned those ALJ findings because, although the ALJ "discussed each of claimant's impairments[, he] failed to analyze the cumulative effect the impairments had on the claimant's ability to work." *Id.* at 50.

Similarly, the ALJ's fragmented examination of Plaintiff's impairments in this matter is insufficient.  The ALJ's declaration that "the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)[,]" (Tr. 20), is insufficient under the law. *See Walker*, 889 F.2d at 50 (such a "finding in itself, however, is not sufficient to foreclose disability.")

Here, the ALJ found that Plaintiff suffered from the following four "severe" impairments: degenerative joint disease of the cervical and lumbar spine; fibromyalgia

(myofascial pain syndrome); osteoarthritis of the hands; and a depressive disorder with anxiety. (Tr. 19.) The ALJ discussed each of these severe impairments separately on pages 24 and 25 of his decision, and separately considered the effect or non-effect of each impairment on Plaintiff's ability to work. (Tr. 24–25.) For each of the four severe impairments, the ALJ examined relevant evidence and set out the functional limitations that he found each severe impairment to place on Plaintiff's ability to work. (*Id.*) Nowhere, though, does the ALJ discuss how and whether he considered the combined cumulative effect of these limitations and whether, together, the limitations rendered her disabled. *See Walker*, 889 F.2d at 50 (holding ALJ must "adequately explain his or her evaluation of the combined effect of the impairments.")

Further, the ALJ also noted that Plaintiff had complaints of headaches, vertigo, diverticulitis, and urinary incontinence. (Tr. 19.) Although the ALJ found these alleged impairments to be "non-severe," (*id.*), he should have considered these claimed impairments in combination with each other and in combination with the severe impairments. The ALJ also should have included adequate explanation of his consideration of the severe and non-severe complaints and impairments in his decision. *Walker*, 889 F.2d at 50.

Therefore, it is recommended that the decision be remanded to the ALJ so that he can examine the combined effect of all of Plaintiff's impairments, severe and non-severe, and, in the decision on remand, explain his evaluation of the combined effect of Plaintiff's multiple impairments.

2.    Weight of the Lay Evidence

Plaintiff's next allegation of error is that the ALJ improperly ignored lay evidence offered by her social friends, Ms. Narma Daig and Ms. Peggy Davis.[2] (Pl.'s Br. 18–19.) Plaintiff argues that this evidence corroborates her medical records, hearing testimony, and letters from Drs. Bray and Blakley and from Ms. Blaydes and Ms. Bunch. (*Id.*) According to Plaintiff, the ALJ's failure to discuss the lay evidence in his decision violates Social Security Ruling 06-30p (SSR 06-30p), which indicates that an ALJ "generally should explain the weight given to opinions from other sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." (Pl.'s Reply 2–3.)

As the Commissioner correctly points out, the portion of SSR 60-30p on which Plaintiff relies addresses "opinions from 'other sources' . . . who have seen the claimant in their *professional* capacity." (Def.'s Br. 28 (citing SSR 60-30p) (emphasis added).)  SSR 60-30p recites factors that appropriately should be considered when evaluating evidence from those who have not seen the claimant in a professional capacity—including "spouses, parents, friends, and neighbors"—but is silent on any requirement or suggestion that the ALJ must detail in his written decision the weight given these non-professionals. *See* SSR 60-30p.

_____

[2]Essentially, the lay witnesses anecdotally explain what they observed to be worsening of Plaintiff's condition and indicate their beliefs that Plaintiff is in severe pain. (*See* Tr. 88–91.)

The court agrees with the Commissioner. The ALJ was not required to set out in detail the consideration he gave (or did not give) the statements of Ms. Daig and Ms. Davis.

3.      Residual Functional Capacity Assessment

Plaintiff's next allegation of error is that the ALJ's RFC Assessment was improper because it is contrary to the medical evidence and to the ALJ's own findings of fact in the decision at issue. (Pl.'s Br. at 20.) Plaintiff claims the ALJ erred in finding her capable of medium work with some limitations when, at the same time, he found that she suffers from four severe impairments. Plaintiff also specifically complains that the ALJ's RFC assessment is flawed and inconsistent because he found Plaintiff suffers from severe osteoarthritis of the hands, but the RFC findings indicate she can perform frequent fingering. (*Id.*; *compare* Tr. 19, 24 *with* Tr. 21.)

The Commissioner does not respond to this allegation of error separately, but combines it with its discussion of Plaintiff's combination-of-impairments allegation of error. (*See* Def.'s Br. 21–24.) This is unsurprising because the ALJ's consideration of Plaintiff's impairments in combination with one another may impact the determination of Plaintiff's RFC. In light of the recommendation of remand for additional consideration and discussion of Plaintiff's severe and non-severe impairments in combination, the ALJ's findings as to Plaintiff's RFC assessment may change, and further findings are appropriate to supplement the RFC analysis. Therefore, it is unproductive to separately address the assessed error at this time.

4.      Weight and Credibility of Treating Medical Sources' Opinions

Plaintiff's last allegation of error is that the ALJ erred and violated Social Security Ruling 96–2p (SSR 96–2p) by affording no weight to the opinions of Plaintiff's treating medical sources—Drs. Bray and Blakley and Ms. Blaydes.  (Pl.'s Br. 22–23.)  SSR 96–2p provides that if a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]"  *See also* 20 C.F.R. § 404.1527(d) (setting out factors Commission is to consider in weighing medical opinions).

Plaintiff sets out excerpts of the reports of Drs. Bray and Blakley and Ms. Blaydes, emphasizing the following portions of each in bold:

Dr. Bray:

•       "I am requesting that you consider [Plaintiff] for disability at this time since she has been unable to hold her previous job." (Pl.'s Br. 21, citing Dr. Bray's letter of Jan. 28, 2004, found at Tr. 213.)

•       "[Plaintiff] has not been able to hold a job since her overall medical condition worsened in June 2003.  I concur with your assessment that her mental condition does limit her ability to work.  However, her physical condition is severe enough that it does likewise. . . . She is not expected to fully recover, and will not to the degree of being able to return to work within the next 12 months and beyond." (Pl.'s Br. 22, citing Dr. Bray's letter of July 28, 2004, found at Tr. 212.)

Ms. Blaydes:

•       "[These symptoms exhibited by Plaintiff] severely impair her ability to socialize, to gain employment, and to care for her everyday needs."  (Pl.'s Br. 21-22, citing Ms. Blaydes' letter of May 24, 2004, found at Tr. 192.)

Dr. Blakley:

- "In addition to the multiple aches and complaints which plague her daily existence from her medical problems, the psychiatric burden of her anxiety attacks prevent [sic] her from maintaining gainful employment." (Pl.'s Br. 22, citing Dr. Blakley's letter of April 12, 2006, found at Tr. 337.)

- "[Plaintiff's] previous employment involved a significant amount of typing which is very difficult with her hand symptoms. She also finds it difficult to sit in place or stand for prolonged periods due to her neck and back pain." (Pl.'s Br. 22-23, citing Dr. Blakley's letter of Nov. 24, 2006, found at Tr. 338.)

The Commissioner responds by pointing out that the ultimate question of whether a claimant is "disabled" under the statutory and regulatory scheme is one for Commissioner, not for medical sources. (*Id.* at 25.) The court agrees. Determinations regarding whether a claimant is "disabled" and related legal conclusions are administrative determinations for the Commissioner and not for medical personnel. 20 C.F.R. § 404.1527(e) (noting certain opinions by medical sources—such as being "disabled" or "unable to work"—are not afforded "special significance"). The ALJ did not err by discounting these portions of opinions by Plaintiff's medical sources.

Plaintiff also claims that these opinions, set out in more detail in Plaintiff's Brief at pages 21–23, are "well-supported and consistent with the claimant's record as a whole." (Pl.'s Br. 23.) Further, Plaintiff argues that, even if these opinions are not afforded controlling weight, the ALJ erred by giving them no weight at all. (Pl.'s Reply 3.) Plaintiff asserts that the ALJ did not sufficiently explain his reasoning and analysis of the medical opinions as required by administrative rules and regulations. (*Id.*)

The Commissioner defends the ALJ's decision by claiming these opinions were not consistent with the medical evidence.[3] (Def.'s Br. 24–25.) The Commissioner discusses the ALJ's consideration of the opinions of Dr. Bray, claiming that the ALJ adequately explained why he did not afford Dr. Bray's opinion any weight. (*Id.*, at 25.)

The court agrees that the ALJ did offer some explanation for his decision to give no weight to Dr. Bray's opinion. For example, the paragraph regarding that opinion cites to portions of several medical records that the ALJ found did not support Dr. Bray's opinion. (Tr. 27.) However, the undersigned submits that the ALJ did not adequately consider the medical opinion of Dr. Bray in combination with the opinions and records of other medical professionals in the record in this matter. The ALJ did not cite to or mention Dr. Bray's opinion of record that indicated Plaintiff had multiple medical problems that should be considered. By letter, Dr. Bray indicated that Plaintiff "has multiple medical problems that myself [sic] and subspecialist(s) have been following." (Tr. 213.) Dr. Bray identifies those "ongoing medical problems" as follows:

> Myofascial pain syndrome (followed by Dr. Kelly-PM&R), Fibromyalgia/OA [osteoarthritis] (followed by Dr. Brittis-Rheumatology), Diverticular disease with recurrent diverticulitis, and progressive DJD of her cervical spine (previously seen and evaluated in our Orthopedics clinics as well).

_____

[3] The Commissioner also asserts that Dr. Blakley and Ms. Blades were not treating sources whose opinions may merit controlling weight pursuant to SSR 96–2p. (Def.'s Br. 24–25.) Because remand is recommended for consideration of all evidence in combination, the undersigned does not specifically address this argument of the Commissioner.

(*Id.*)  Dr. Bray lists other "stable medical conditions" and continues by explaining that "[a]s a result [of these problems], we collectively have had to intensify her treatment here at the naval hospital."  (*Id.*)

In other words, Plaintiff's treating physician Dr. Bray is on record that Plaintiff's medical condition requires "collective" focus by multiple medical professionals.  In view of the ALJ's failure to consider and explain his findings as relate to all of Plaintiff's impairments in combination as discussed above, the undersigned recommends that, upon remand, the ALJ consider all of Plaintiff's impairments in combination and re-examine Dr. Bray's opinions in light of the combination of impairments. On remand, the ALJ's consideration of Plaintiff's impairments—both severe and non-severe—should be examined as required by the Fourth Circuit's direction in *Walker* and as Dr. Bray's letter about Plaintiff's treatment implies.

On remand, the ALJ should consider the record as a whole—all medical records and opinions, including those of Dr. Bray—when evaluating Plaintiff's severe and non-severe impairments in combination.

III.    Conclusion and Recommendation

Based upon the foregoing, the court cannot conclude that the ALJ's decision to deny benefits was supported by substantial evidence.  Therefore, it is recommended that the Commissioner's decision be reversed and remanded under sentence four of 42 U.S.C. § 405(g) for additional consideration as set out herein.

IT IS SO RECOMMENDED.


June 14, 2010                           Shiva V. Hodges
Florence, South Carolina                United States Magistrate Judge